UNITED STATES BANKRUPTCY COURT
DISTRICT OF RHODE ISLAND

In re:

    MICHAEL A. CORRENTE                                 BK. 15-11313
    Debtor                                                             CHAPTER 7

_____

FRANK ZAMMIELLO,
    Plaintiff

               VS.                                                                A.P. 15-

MICHAEL A. CORRENTE,
    Defendant

## COMPLAINT OBJECTING TO DISCHARGE OF DEBTOR PURSUANT TO 11 U.S.C. §727 AND TO DETERMINE DISCHARGEABILITY OF DEBT UNDER 11 U.S.C. §523

Now comes, Frank Zammiello, by and through counsel, and files this Complaint Objecting to Discharge of Debtor pursuant to 11 U.S.C. § 727(a)(4)(A) and Bankruptcy Rule 4004(d) and 7001(4) of the Federal Rules of Bankruptcy Procedure (Count 1), and to Determine Dischargeability of Debt pursuant to 11 U.S.C. §523(a)(2)(A) and §523 (a)(6), and Bankruptcy Rules 4007(e) and 7001(6), of the Federal Rules of Bankruptcy Procedure (Counts II and III, respectively).

## PARTIES

1. Plaintiff, Frank Zamiello, is a creditor and party in interest in this proceeding.

2. Defendant, Michael A Corrente, is an individual residing at 441 Atwells Avenue Providence, RI 02903 and is the Debtor in the above-captioned bankruptcy case.

## JURISDICTION

3. This Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §1334 and venue is proper pursuant to 28 U.S.C. § 1409.

4. This is a core proceeding pursuant to 28 U.S.C. §157.

5. This Court has personal jurisdiction over the Defendant.

## FACTS RELATIVE TO COUNT I

## OBJECTION TO DISCHARGE OF DEBTOR PURSUANT TO 11 U.S.C. §727

6. Defendant filed a voluntary petition under Chapter 7 of the U.S. Bankruptcy Code on June 29, 2015.

7. On June 29, 2015, Defendant filed all bankruptcy schedules and statements with his voluntary petition.

8. Defendant reported no gross income from salary, wages, or commissions on Line 4 of Schedule, I. *See* Docket #1, Page 22 of the voluntary petition.[1]

9. Defendant reported total monthly income, from residual checks, of $416.67 on Line 12 of Schedule I. *See* Docket #1, Page 23 of the voluntary petition.

10. Defendant signed the Declaration Concerning Debtor's Schedules, attesting to the accuracy of the information reported therein, under penalty of perjury. *See* Docket #1, Page 26 of the voluntary petition.

---

[1] All docket numbers referenced in the within complaint refer to Ch. 7 BK No. 15-11313 filed by Defendant with the United States Bankruptcy Court for the District of Rhode Island on June 29, 2015.

11. Defendant reported income from employment or operation of business of $1,864.00 in 2013, $956.00 in 2014, and $750.00 (year to date) in 2015 on his Statement of Financial Affairs. *See* Docket #1, Page 27 of the voluntary petition.

12. Defendant signed the Declaration of his Statement of Financial Affairs, attesting to the accuracy of the information reported therein, under penalty of perjury. See Docket #1, Page 35 of the voluntary petition.

13. The Section 341 Meeting of Creditors for Defendant's voluntary petition was held on July 27, 2015.

14. Trustee Geremia presided over the 341 Meeting.

15. Defendant appeared and gave testimony, under oath, at the Section 341 Meeting on July 27, 2015, before Trustee Geremia and swore to tell the truth.

16. Defendant testified, under oath, that the schedules and statements attached to the voluntary petition were true and accurate.

17. After the examination of Defendant, the 341 Meeting was continued to September 17, 2015.

18. On September 9, 2015, in response to a request from Plaintiff, Defendant provided copies of certain tax returns, bank statements and other documents, including the bank account statements from Eagle Beach Productions, Inc. (hereafter, "Eagle Beach").

19. Defendant testified at the 341 Meeting that he is the sole shareholder and officer of Eagle Beach.

20. The bank statements of Eagle Beach clearly evidence that during 2013, 2014 and 2015, Defendant had significant income at his disposal from and through the bank accounts of

Eagle Beach that he failed to disclose on his original Schedules and Statement of Financial Affairs.

21. A significant portion of the undisclosed Eagle Beach funds were used by Defendant for Defendant's personal expenses.

22. On September 16, 2015, seven days after providing bank statements to Plaintiff's counsel, Defendant filed an Amended Schedule I and Statement of Financial Affairs

23. Defendant reported no change to his combined monthly income on the Amended Schedule I. *See* Docket No. 12, Pages 1-2.

24. Defendant reported income from employment or operation of business of $147,339.00 in 2013, $129,629.00 in 2014, and $28,634.50 (year to date) in 2015 on his Amended Statement of Financial Affairs. *See* Docket No. 12, Page 3.

25. Defendant signed the Declaration of his Statement of Financial Affairs, attesting to the accuracy of the information reported therein, under penalty of perjury. *See* Docket No. 12, Page 11.

## COUNT I

## OBJECTION TO DISCHARGE OF DEBTOR PURSUANT TO 11 U.S.C. §727(a)(4)(A)

26. The Plaintiff hereby repeats and reasserts the allegations contained in the preceding 25 paragraphs, as if fully set out herein.

27. The Defendant made statements under oath on his bankruptcy Schedules and Statement of Financial Affairs.

28. The Defendant made statements under oath at his Section 341 meeting of creditors on July 27, 2015.

29. The statements made by Defendant on his Schedule I and Statement of Financial Affairs as well as while under oath at the Section 341 meeting of creditors were false.

30. Defendant knew that Schedule I contained false information regarding his current monthly income.

31. Defendant knew that his responses on his Statement of Financial Affairs were false, the intent and effect of which was to hide and obscure Defendant's true financial condition and affairs.

32. Defendant knew that statements he made under oath at his Section 341 meeting of creditors were false.

33. Defendant made false statements on his bankruptcy Schedules and Statement of Financial Affairs and at his Section 341 meeting of creditors with fraudulent intent.

34. The Defendant's false and fraudulent statements on his bankruptcy Schedule and Statement of Financial Affairs and at his Section 341 meeting of creditors related materially to his bankruptcy case.

35. Defendant knowingly and fraudulently made multiple false oaths in connection with his bankruptcy case which justifies a denial of discharge under 11 U.S.C. §727(a)(4)(A).

36. Plaintiff further avers that based upon the foregoing facts and others that will be developed in the course of discovery, the Defendant's actions are in contravention of the provisions of 11 U.S.C. §727(a)(4)(A) and, therefore, constitute grounds to deny the Defendant's discharge.

WHEREFORE, the Plaintiff prays that the Court enter judgment for the Plaintiff, enter an

Order denying the Debtor a Discharge pursuant to 11 U.S.C. § 727(a)(4)(A) and for such further relief as the Court deems just and appropriate.

## FACTS RELATIVE TO COUNTS II AND III

## DETERMINATION OF DISCHARGEABILITY OF DEBT UNDER 11 U.S.C. §523

37. The Plaintiff hereby repeats and reasserts the allegations contained in the preceding 36 paragraphs, as if fully set out herein.

38. Newco Entertainment, LLC ("Newco") is a New York limited liability company.

39. Nailed L.P. ("Nailed") is a Delaware limited partnership.

40. Eagle Beach Production, Inc. ("Eagle Beach") is a Rhode Island Corporation.

41. The General Partner of Nailed is Newco.

42. Eagle Beach is the sole Class A Member of Newco.

43. Defendant is the only officer of Eagle Beach.

44. At all times relative to the complaint, Defendant controlled and acted on behalf of both Nailed and Newco and also Eagle Beach

45. At all times relative to the complaint, Defendant was in the entertainment business, both producing and directing motion pictures.

46. Defendant had a reputation as a successful and talented film director and producer, and had achieved much favorable notoriety, particularly in Rhode Island.

47. Prior to the late summer/early fall of 2004, Defendant had produced and/or directed a number of films, such as Door in the Floor, I'll Sleep When I'm Dead, Federal Hill, Outside Providence and American Buffalo, which films had received favorable reviews.

48. In 2004, Defendant was engaged in making a film eventually entitled "Brooklyn Rules" (hereafter referred to as "the Film").

49. Defendant used Newco and Nailed to make the Film by, *inter alia,* raising funds for the Film consisting of both multiple loans and investments.

50. On October 4, 2004, Plaintiff was introduced to and met with Defendant at Plaintiff's place of business in Warwick, R.I.

51. At the October 4, 2004 meeting, Defendant represented to Plaintiff that he was shooting the Film, was about half-way finished, and that an investor who had agreed to provide funding of about $4 Million for the Film had pulled out of the project in the late summer/early fall of 2004.

52. At that October 4, 2004 meeting, Defendant told Plaintiff that he needed funding of $2M in order to complete shooting the Film.

53. As of Fall 2004, Plaintiff had no expertise or experience in the film industry.

54. Defendant told Plaintiff that he believed that the Film was an excellent film, indeed, academy award quality, and that it would significantly help Defendant's career, "elevating it to the next level."

55. Defendant stated that once the shooting of the Film was completed, he was confident that he could get a distributor to buy the Film, which purchase would generate a significant amount of money and Plaintiff would be repaid.

56. Defendant represented to Plaintiff that he had been successful in having distributors buy his previous films and assured Plaintiff that he could and would get a distributor to buy the Film.

7

57. Defendant advised Plaintiff that such a sale would be consummated in very early 2005.

58. Defendant asked Plaintiff to provide the $2M needed to complete the shooting of the Film.

59. Plaintiff told Defendant that he would lend Defendant $2M on the condition that Defendant had to personally guaranty repayment of Plaintiff's loan.

60. Plaintiff stressed and made clear to Defendant that he would not make the loan unless Defendant personally agreed to repay it and that Plaintiff was looking to and relying upon Defendant to repay the loan.

61. Defendant represented to Plaintiff that even if the film were not sold to a distributor in early 2005, by having the Film shot, so-called "in the can," using Plaintiff's $2M loan to do so, Defendant could easily obtain sufficient funds from others so that he could and would repay Plaintiff the $2M loaned by Plaintiff.

62. Defendant agreed to personally guarantee repayment of Plaintiff's loan and told Plaintiff that he would personally repay the loan if it were not otherwise repaid.

63. After the October 4, 2004 meeting, Defendant had an attorney, who was representing only Newco and Nailed, draft loan documents reflecting the terms of the $2M loan, including the personal guarantee of Defendant to repay the loan. Those documents are hereto attached as Exhibit A and constitute the Loan Agreement among Plaintiff, Defendant, Newco and Nailed.

64. The Loan Agreement provided that Defendant, Newco and Nailed were each, jointly and severally, obligated to repay to Plaintiff the $2M loan.

65. The Loan Agreement provided for interest and, in the event Plaintiff had to undertake efforts to collect the monies he loaned Defendant, Newco and Nailed, reimbursement of attorney's fees and costs incurred by Plaintiff in recovering the monies owed to him by Defendant, Newco and Nailed.

66. Defendant was actively engaged in the drafting of the Loan Agreement and was well aware of the terms, including his personal guarantee of repayment of the loan.

67. Defendant signed the loan documents no less than nine (9) times.

68. Not only did Defendant sign the documents setting forth the terms of the loan nine (9) times and obligate himself to repaying the loan, but he expressly and explicitly acknowledged and represented in a document entitled "loan agreement" that he would "receive a direct benefit, interest and advantage arising out of the Loan from Lender [Plaintiff] and Corrente [Defendant] acknowledges and agrees that Lender is willing to deliver the Loan only if Corrente [Defendant] personally guarantees repayment of the Loan to Lender" and that he "personally guarant[ees] repayment of the Loan to Lender."  *See* Exhibit A.

69. In making the $2M loan, Plaintiff justifiably relied upon the representations of Defendant that he would, *inter alia*, personally repay the loan.

70. Plaintiff justifiably believed that Defendant had the ability to or would be in a position to personally repay the loan based on Defendant's success in the entertainment industry.

71. At the time Defendant made the representations that he would personally repay the loan, he did not intend to do so.

72. Defendant has admitted under oath that he never intended to personally repay the loan.

9

73. Defendant knowingly, willfully, and intentionally made false representations to Plaintiff as to his personally repaying the loan with the intent of inducing and in order to induce Plaintiff to make the loan.

74. Defendant did not repay to Plaintiff any portion of his $2M loan.

75. Neither Newco nor Nailed repaid Plaintiff any portion of his $2M loan.

76. Defendant, in bad faith, disavowed his contractual obligations and has refused to repay and continues to refuse to repay any portion of his $2M loan to Plaintiff.

77. In September 2010, Plaintiff instituted a civil action against Defendant, Newco and Nailed in the Rhode Island Superior Court encaptioned as C.A. No.: P.C. 2010-5352.

78. Plaintiff set forth in his Rhode Island State Court Complaint Counts of Book Account (Count I), Breach of Contract (Counts II through IV), Breach of Implied Covenant of Good Faith (Count VI) and Fraud (Count V).

79. In ruling on Plaintiff's Summary Judgment Motion filed in the Rhode Island State Court action as to the Plaintiff's Breach of Contract Count, i.e., the Loan Agreement (Count II), the Rhode Island Superior Court found that the Loan Agreement was a valid, binding enforceable Agreement and by the Court's Orders of March 11, 2013, and October 24, 2014, Exhibits B and C hereto, ruled that: (a) Plaintiff and Defendant (as well as Nailed and Newco) entered into the Loan Agreement; (b) Defendant (and Nailed and Newco) breached the Loan Agreement; (c) that breach of the Loan Agreement damaged Plaintiff; and (d) Defendants Corrente, Nailed and Newco are liable, jointly and severally, to Plaintiff in an amount of no less than $2M and for interest on the loan.[2]

---

[2] The issues remaining to be decided by the Court as to Count II (Breach of the Loan Agreement) are, inter alia, the amount of interest Defendants are obligated to pay Plaintiff, along with the amount of attorneys fees and costs which Defendants should reimburse to Plaintiff.

80. In the Rhode Island State Court action, Plaintiff served multiple sets of interrogatories, requests for admissions, and document requests and conducted the depositions of all Defendants.

81. Plaintiff was scheduled to conduct the deposition of two witnesses in July 2015, when he learned of the filing of Defendant's Bankruptcy Petition. Plaintiff has not undertaken any further activities in the Rhode Island State Court action since then.

## COUNT 2

## DETERMINATION OF DISCHARGEABILITY OF DEBT UNDER 11 U.S.C. §523(a)(2)(A)

82. The Plaintiff hereby repeats and reasserts the allegations contained in the preceding 81 paragraphs, as if fully set out herein.

83. Defendant made numerous false representations to Plaintiff in connection with the $2M loan.

84. At the time Defendant entered into the $2M loan, Defendant falsely represented to Plaintiff that he would personally repay the loan.

85. Defendant did not and never intended to personally repay the loan.

86. At the time Defendant into the $2M loan, Defendant falsely represented to Plaintiff that he had the ability to obtain sufficient funds to repay the loan.

87. Defendant knew that he did not and that he could not obtain such funds or he made such representation with reckless disregard for the truth of his ability to repay the loan.

88. The false representations of Defendant were material and induced Plaintiff into making the $2M loan.

89. Defendant made these false representations with knowledge of their falsity or reckless indifference as to their truth.

90. Defendant made these false representations with the intent to deceive Plaintiff.

91. Defendant used these false representations made with the reckless disregard for their truth with the intent to induce Plaintiff into making the $2M loan.

92. Plaintiff justifiably relied upon these false representations of Defendant in making the $2M loan.

93. But for Defendant's false representations, Plaintiff would not have made the loan.

94. Plaintiff's reliance on Defendant's false representations was justifiable as Plaintiff had no reason to believe that Defendant was not telling the truth based on Defendant's apparent wealth and vast experience in the entertainment industry.

95. Plaintiff's justifiable reliance upon Defendant's false representations directly and proximately caused him to suffer the damages herein described, including not being repaid the monies owed and the monies expended in prosecuting the Rhode Island State Court action against Defendant.

96. As a consequence, Defendant's debt to Plaintiff should be determined to be nondischargeable.

97. Further, the conduct of Defendant, as above described, constituted actual fraud and engaging in false pretenses in order to obtain the loan, which conduct (actual fraud and false pretenses) directly caused Plaintiff's damages. Thus, Defendant's debt to Plaintiff should be determined to be nondischargeable.

98. Plaintiff further avers that based upon the foregoing facts and others that will be developed in the course of discovery, the Defendant's actions are in contravention of the

provisions of 11 U.S.C. §523(a)(2)(A) and, therefore, constitute grounds to determine the debt owed to Plaintiff is nondischargeable.

WHEREFORE, the Plaintiff prays that the Court enter judgment for the Plaintiff, enter an Order determining that the debt of Defendant to Plaintiff in the amount of $2,000,000, plus interest, is not dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), and for such further relief as the Court deems just and appropriate.

## COUNT 3

## DETERMINATION OF DISCHARGEABILITY OF DEBT UNDER 11 U.S.C. §523(a)(6)

99. The Plaintiff hereby repeats and reasserts the allegations contained in the preceding 98 paragraphs, as if fully set out herein.

100. Although Defendant falsely represented that he would personally repay Plaintiff the $2M loan and knowingly entered into a Loan Agreement by which he promised to so do, Defendant did not repay the loan, refused to repay the loan, and in bad faith defended against his liability in the Rhode Island State Court Action.

101. In the Rhode Island State Court action, Defendant, *inter alia*, raised sham, spurious and specious defenses, gave false and misleading sworn testimony, gave false and misleading testimony based upon reckless disregard for the truth, gave wholly incredible testimony, gave inconsistent testimony, repeatedly changed his position throughout the litigation and failed to advise the Court of untrue sworn statements he made after admitting that his prior sworn statements were false.

102. In the Rhode Island State Court action, Defendant claimed that he was not liable to Plaintiff under the Loan Agreement because he had not read the loan documents, despite having

been actively involved in their drafting and admitting to others that he loaned the $2M from Plaintiff and was obligated to repay Plaintiff.

103. In the Rhode Island State Court action, Defendant engaged in deliberate, intentional, and willful misconduct in an effort to obfuscate the issues and mislead the Court in an outrageous effort to forestall and prolong the ultimate resolution of that civil action.

104. This egregious bad faith conduct of Defendant was inflicted intentionally and maliciously upon Plaintiff.

105. As a result of Defendant's conduct in the Rhode Island State Court action, Plaintiff suffered willful and malicious injury in the form of litigation expenses.

106. The litigation expenses are part of Defendant's debt and should be deemed nondischargeable due to Defendants willful and malicious conduct.

107. Plaintiff further avers that based upon the foregoing facts and others that will be developed in the course of discovery, Defendant's actions are in contravention of the provisions of 11 U.S.C. §523(a)(6) and, therefore, constitute grounds to determine the debt owed to Plaintiff is nondischargeable.

WHEREFORE, the Plaintiff prays that the Court enter judgment for the Plaintiff, enter an Order determining that the debt of Defendant to Plaintiff in the amount of $2,000,000, plus interest, along with the litigation expenses incurred by Plaintiff in the Rhode Island State Court Action, are not dischargeable pursuant to 11 U.S.C. § 523(a)(6), and for such further relief as the Court deems just and proper.

                                              Frank Zammiello,
                                              By his Attorneys,

                                              /s/ Thomas P Quinn
                                              Thomas P. Quinn #4780

McLaughlin & Quinn, LLC
148 West River Street, Suite 1E
Providence, RI 02904
Tel. (401) 421-5115
Fax. (401) 421-5141
E-mail: tquinn@mclaughlinquinn.com

/s/ George E. Lieberman
George E. Lieberman, #3860
VETTER & WHITE
Center Place
50 Park Row West – Suite 109
Providence, Rhode Island 02903
Tel. (401) 421-3060
Fax. (401) 272-6803
E-mail: glieberman@vetterandwhite.com

/s/ Anthony J. Bucci, Jr.
Anthony J. Bucci, Jr., # 2599
155 South Main Street, Ste. 405
Providence, Rhode Island 02903
Tel. (401) 831-4200 x217
Fax. (866) 340-1835
E-mail: abucci@buccilaw.com